BOARD OF EDUCATION, SPRINGFIELD PUBLIC SCHOOLS, DISTRICT NO. 186, SANGAMON COUNTY, Plaintiff-Appellee and Cross-Appellant, *v.* LINDA McCOY, Defendant-Appellant and Cross-Appellee (The Illinois State Board of Education, Defendant).

Fourth District    No. 4—83—0517

Opinion filed April 5, 1984.—Modified on denial of rehearing June 8, 1984.

Drach & Deffenbaugh, P.C., of Springfield, for appellant.

Billington & Billington, of Springfield, for appellee.

JUSTICE WEBBER delivered the opinion of the court:
The defendant Linda McCoy (McCoy) was a tenured teacher in the employ of the plaintiff board of education, Springfield Public Schools,

District No. 186, Sangamon County, Illinois (Board), and was dismissed by the Board on March 26, 1979. Administrative hearings pursuant to the appropriate provisions of the School Code were had (Ill. Rev. Stat. 1979, ch. 122, par. 24—12), and the hearing officer found that McCoy should be reinstated. The Board appealed to the circuit court of Sangamon County which reversed the hearing officer. McCoy then appealed to this court. In a divided order under Supreme Court Rule 23 (87 Ill. 2d R. 23) (98 Ill. App. 3d 1206), this court reversed the circuit court and upheld the decision of the hearing officer.

McCoy was reinstated on March 2, 1982. Thereafter controversy arose over the amount of damages to be awarded to her pursuant to section 24—12 of the School Code which provides in pertinent part:

> "If a decision of the hearing officer is adjudicated upon review or appeal in favor of the teacher, then the trial court shall order reinstatement and shall determine the amount for which the board is liable including but not limited to loss of income and costs incurred therein." Ill. Rev. Stat. 1981, ch. 122, par. 24—12.

Hearings were held in the circuit court of Sangamon County which entered its final order on June 23, 1983. McCoy was allowed all the income she would have received from the Board for the applicable school years, 1978-79 through 1981-82. This was offset by the amounts she received prior to her dismissal and after her reinstatement. It was further offset by all income earned by her at other jobs during the period of her dismissal, except income from a summer job at the Illinois State Fair; a further offset consisted of sums received as unemployment compensation benefits from the States of Illinois and Texas. McCoy sought, and was denied by the trial court, claims for consequential damages, *i.e.*, fringe benefits provided by the Board, losses from forced liquidation of assets, interest expense on loans, and sick leave. The trial court allowed interest at 6% from the time of the hearing officer's decision but denied prejudgment interest for the time prior to that decision.

McCoy has appealed the trial court's order and the Board has cross-appealed. McCoy raises four principal complaints about the trial court's order: (1) There should have been no offset for money earned at jobs outside the teaching profession, described by her as "menial"; (2) there should have been no offset for unemployment compensation benefits received; (3) prejudgment interest should have been allowed; and (4) consequential damages should have been allowed.

In its cross-appeal the Board complains (1) that McCoy should not be awarded loss of income damages for any times in which she elected

to receive unemployment benefits, or in which she did not actively seek other employment, or avoided it; and (2) that the interest award was improper.

We affirm in part, reverse in part, and remand for a recalculation of damages.

A brief synopsis of the pertinent evidence received at the hearings below is appropriate. McCoy testified as to her repeated efforts to obtain a teaching job in other districts in and about Springfield and Sangamon County, but these were to no avail. She also took civil service examinations for jobs with the State of Illinois in the areas of public information officer and social worker. She also applied to the Springfield Recreation Department, travel agencies, the Governor's Council on Health and Fitness (she was a physical education instructor), Sangamon County Alcohol/Drug Abuse Council, Sangamon State University, Youth Service Bureau, as well as hospitals and nursing homes. When none of these proved fruitful, she applied at numerous restaurants, clubs, and retail establishments (the "menial" jobs).

She did obtain some substitute teaching at Rochester, Sangamon County, schools. This amounted to 24 days during 1979 and 1980. She also worked as a waitress, bartender, and private tutor, and in summer months as an assistant director of special events at the Illinois State Fair. Her most continuous employment was with the Department of Transportation of the State of Illinois. She worked as a cement lab worker from April 1980 to February 1982. She claimed that, with the exception of the Department of Transportation job, all the work was done outside of what would have been regular school hours. Prior to her dismissal she taught Monday through Friday from 8:15 a.m. to 3:30 p.m. She was not required to work during weekends, evenings, or summers.

Following her dismissal, McCoy applied for and received unemployment compensation benefits, $3,514 from the State of Illinois and $1,083 from the State of Texas where she had worked in 1978. She testified as to certain fringe benefits which she received as an employee of the Board, life insurance, medical insurance, personal leave days, and sick leave. An individual from the Illinois Education Association testified that the value of these benefits for the time between McCoy's dismissal and reinstatement was $717.40. He also testified that under the collective bargaining contract with the Board, a teacher's sick leave accumulates from year to year and that unused personal leave days also accumulate from year to year as accumulated sick leave.

McCoy also testified as to her straightened financial circum-

stances during the period of dismissal. She surrendered a retirement annuity, used up her savings, borrowed money from friends and relatives, obtained a loan from her credit union to cover debts, and sold her antiques at a loss.

An individual from the Board's business office testified that the Board had received a notice from the Illinois Department of Labor that out of any award made to McCoy, $3,514 of it would be required to be payable jointly to McCoy and the Director of Labor, apparently in a recoupment of unemployment compensation benefits paid.

The first principal issue to be considered is the work performed by McCoy during the period of her dismissal. The battle lines, as drawn by the parties, are fairly clear. McCoy maintains that she was not required to seek nor obtain anything other than a teaching job (denominating other jobs as "menial") and hence there should be no offset from her damage award as a result of the jobs which she took. The Board, *contra*, maintains that McCoy spent much of the time during dismissal taking vacations in Texas, Florida, and Mexico; drawing unemployment benefits; and generally not actively seeking other employment. It claims she should not be awarded any "loss of income" damages for those periods.

We are not persuaded that either theory has validity. The record is clear that McCoy made extensive efforts to seek employment, and there is no proof that the trips to Texas, Florida, and Mexico were made for frivolous purposes. The use of unemployment benefits is today so pervasive in our society that it no longer carries the opprobrium which was characteristic of yesteryear.

McCoy's theory that she was obligated to seek only academic employment represents an effort to engraft conditions upon the law which do not exist. She cites a variety of cases from other jurisdictions which have so held, but there is no such authority in Illinois. Some earlier cases (*School Directors v. Kimmel* (1889), 31 Ill. App. 537; *Betebenner v. Board of Education* (1949), 336 Ill. App. 448, 84 N.E.2d 569) contain some *dicta* to that effect, but the modern rule is stated in *Bessler v. Board of Education* (1977), 69 Ill. 2d 191, 198-99, 370 N.E.2d 1050, 1053-54:

> "The appropriate remedy for the wrongful discharge of a non-tenured teacher is an action for breach of contract. [Citation.] The measure of damages is the salary provided in the contract [citation] reduced by such sums as the wrongfully discharged teacher has earned or by reasonable diligence could have earned in other employment subsequent to the discharge [citation]. The employer has the burden of showing that the em-

ployee could or did have other earnings subsequent to the wrongful discharge and that those earnings stemmed from employment incompatible with the employment from which he was wrongfully discharged."

We perceive no qualitative difference in the application of the rule to tenured teachers. The test to be applied is not the nature of the work but whether the subsequent earnings were compatible or incompatible with school employment.

Webster's Second New International Dictionary 544 (1959) defines "compatible" as: "Capable of co-existing in harmony; congruous; accordant; consistent; not repugnant." An illustration of the principle is found in *Board of Education v. Metskas* (1982), 106 Ill. App. 3d 943, 949, 436 N.E.2d 587, 592. In that case the wrongfully discharged orchestra teacher also worked as a musician. The Board sought to offset against his damage award the amounts earned as a musician. The appellate court rejected that approach, saying:

"In our opinion, the trial judge properly ruled the work performed by defendant as a musician was not incompatible with defendant's teaching position. The test for incompatibility is not the amount of earnings from the secondary employment. Rather, the test is whether there are 'regulatory proscriptions or conflicting hours or duties' between the two jobs. (*People ex rel. Bourne v. Johnson* (1965), 32 Ill. 2d 324, 329.) As correctly noted by the trial judge, compatibility between the jobs here was shown in that defendant had worked as a musician throughout the years he was teaching. Defendant testified his duties as a musician continued to be compatible with teaching during the years as these duties were performed only on evenings or on weekends. Plaintiff, whose burden it is to prove the incompatibility of the jobs (*Bessler v. Board of Education* (1977), 69 Ill. 2d 191, 199), did not effectively rebut this testimony. We therefore affirm the finding of the trial judge that plaintiff is not entitled to an offset." 106 Ill. App. 3d 943, 949.

As applied to the instant case, the trial court on remand must determine which of the various positions, waitress, bartender, etc., were compatible with school employment, *i.e.*, were worked outside of regulatory proscriptions or conflicting hours or duties. The total shall not be offset against the award. Those which are found to be incompatible shall be so offset. It appears that the employment at the State Fair was compatible; it was worked in the summer outside of school term; this court may take judicial notice of the fact that the Illinois State Fair is held for 10 days in midsummer. However, should any

contrary evidence appear, such time as might overlap a school term should be deemed incompatible.

Such a rule is only fair to both parties; it allows the teacher to retain what he might have properly had otherwise by working a second job, commonly referred to as "moonlighting." On the other hand, if incompatible work is not allowed as an offset, it would be tantamount to the imposition of punitive damages on the Board. *Wells v. Board of Education* (1970), 121 Ill. App. 2d 112, 257 N.E.2d 252.

The job with the Department of Transportation is clearly incompatible with employment in the schools. It was a full-time job, substitutionary to school employment. McCoy argues that the summer months on this job should not be offset. We do not agree. The nature of the job was such as to prohibit any fracturing of it to fit into a theory of damages.

■ We next consider the offsets allowed for unemployment benefits from the State of Illinois, and find that they were improperly allowed.

An analysis of this problem requires an examination of the interplay of various sections of the Unemployment Insurance Act (Act). Ill. Rev. Stat. 1981, ch. 48, par. 300 *et seq.*

The starting point is the admitted fact that the Board makes payments in lieu of contributions under section 1405(B) of the Act (Ill. Rev. Stat. 1981, ch. 48, par. 555(B)). Under this system, the Board is charged each quarter for the amounts paid out by the Director of Labor as benefits. (Ill. Rev. Stat. 1981, ch. 48, par. 555(C).) There is no indication in this record that this procedure was not followed in McCoy's case. She collected $3,514 in benefits from the Department of Labor, and the Department apparently charged the Board for this amount.

The next significant section of the Act is section 900(D) relating to recoupment (Ill. Rev. Stat. 1981, ch. 48, par. 490(D)). This section provides:

> "Whenever, by reason of a back pay award made by any governmental agency or pursuant to arbitration proceedings, or by reason of a payment of wages wrongfully withheld by an employing unit, an individual has received wages for weeks with respect to which he has received benefits, the amount of such benefits may be recouped or otherwise recovered as herein provided. An employing unit making a back pay award to an individual for weeks with respect to which the individual has received benefits shall make the back pay award by check payable jointly to the individual and to the Director."

It will be remembered that an employee of the Board testified that a notice had been received directing that $3,514 of any award be made payable jointly to McCoy and the Director of Labor. It is thus apparent that the Department of Labor intends to recoup the payments made to McCoy inasmuch as she is not entitled both to back pay and unemployment compensation.

The Board argues that it will be penalized, that it has already paid the Department the $3,514 under the Director's quarterly charge, and that unless it receives an offset, it will pay again. The argument overlooks other provisions of the Act. Section 1405(C) (Ill. Rev. Stat. 1981, ch. 48, par. 555(C)), in addition to providing for the quarterly charge by the Director, also states:

> "All of the provisions of subsection B of Section 1404 pertaining to nonprofit organizations, not inconsistent with the preceding sentence, shall be applicable to payments in lieu of contributions by a governmental entity."

Section 1404(B)(4) (Ill. Rev. Stat. 1981, ch. 48, par. 554(B)(4)) provides:

> "All of the provisions of Section 2201, applicable to adjustment or refund of contributions, interest and penalties erroneously paid and not inconsistent with the provisions of this Section, shall be applicable to payments in lieu of contributions erroneously made or interest or penalties erroneously paid by a nonprofit organization."

Section 2201 referred to (Ill. Rev. Stat. 1981, ch. 48, par. 681) sets up a structure for a refund or adjustment of contributions.

The pattern will then be: $3,514 of the back-pay award will be made payable to McCoy and the Director of Labor; the Director will recoup his payments to which McCoy is not now entitled upon obtaining the back-pay award; the Board will then in a separate proceeding seek a refund of $3,514 from the Director under section 2201. While taking on all the aspects of the Cretan labyrinth, the procedure is that mandated by statute.

It then follows that the trial court was in error in allowing the Illinois unemployment benefits as a setoff. The same is true of the Texas benefits, but for a different reason. There is nothing in the record to indicate that Texas has a recoupment provision similar to that of Illinois. The Board bears the burden of proving that its damages were mitigated. (*Bessler*.) Although it has shown that McCoy received unemployment benefits from Texas, it has failed to show that she will be entitled to keep that money once a back-pay award has been made. Therefore, the setoff reflecting the Texas payments was also improp-

erly made.

■ As to McCoy's consequential damages, we agree with the trial court that much of this was too speculative to support an award. There appears to be no serious argument that McCoy did surrender her annuity policy, borrow money, and dispose of personal assets. However, there was no evidence introduced by her to document her living expenses. The record is clear that she had access to approximately $56,000 during a period in which she would have earned approximately $37,000, had she not been dismissed.

We can find no basis for allowing the value of life and medical insurance during the dismissal period. McCoy has not shown that she incurred any medical expenses. Accordingly, she has not established that she has been affirmatively damaged by the loss of those benefits. (See *Mass v. Board of Education* (1964), 61 Cal. 2d 612, 394 P.2d 579, 39 Cal. Rptr. 739.) She has been damaged by the refusal of the trial court in its order to credit her with accrued sick days during the dismissal period. These must be computed and ordered accrued on remand.

■■ Finally, we turn to the second element in the Board's cross-appeal, the matter of interest. It will be recalled that the trial court allowed interest from the date of the hearing officer's report. This was erroneous. Interest is allowed only on a judgment (Ill. Rev. Stat. 1983, ch. 110, par. 2—1303). The report was not a judgment. The judgment arose upon the order of the circuit court made and entered on June 23, 1983. Interest, if any, accrued from that date.

The leading case on the subject is *Pinkstaff v. Pennsylvania R.R. Co.* (1964), 31 Ill. 2d 518, 202 N.E.2d 512. In that case the plaintiff recovered a judgment against the defendant in 1957 and then took a succession of appeals which terminated in 1961 with a denial of *certiorari* by the United States Supreme Court. The defendant then tendered the amount of the judgment with interest from 1961. The trial court, on plaintiff's motion, corrected the amount, declaring the interest was due from the date of the judgment in 1957. The appellate court reversed and the supreme court then reversed the appellate court and construed the statue in question.

> "Accordingly, we are of the opinion that the purpose and effect of the 1955 amendment [permitting tender] was to express the legislative intent that the plaintiff should be entitled to interest upon his judgment as specified in section 3 even though by appeal he seeks to correct errors therein. ***

> The result here reached is compatible with the legislative philosophy behind the award of interest upon damages between

verdict and judgment which is intended to make the plaintiff whole up to that point. The accrual of interest upon the judgment, regardless of by whom appealed, is only an extension to its logical terminus of the 'make the plaintiff whole' philosophy. This result works no hardship on the judgment debtor because the interest accrues only if and during such time as he fails to make a valid tender. A tender, within the legal meaning of the word, once made, stops the accrual of interest *instanter*. If the judgment debtor makes no tender, he benefits from the use of the money which by his failure to appeal he concedes is due the plaintiff. Thus, he still has the clear cut choice which he always had." 31 Ill. 2d 518, 524-25, 202 N.E.2d 512, 515-16.

We believe that the rationale of *Pinkstaff* is applicable here. The trial court entered a money judgment for the plaintiff; the plaintiff appealed in order to correct errors therein; the Board cross-appealed, but only the matters of unemployment compensation and interest; it thus admitted that the major portion of the judgment was correct. While the sum involved here is less specific and liquidated than that in *Pinkstaff*, it is not incapable of determination by simple mathematics.

Therefore, in summary, the trial court's order is affirmed in part, reversed in part, and remanded with directions to recalculate the award by: (1) determining which of McCoy's jobs, apart from the State Fair and Department of Transportation, were compatible or incompatible with her school employment and eliminating a setoff for such as were compatible; (2) eliminating the setoff for unemployment compensation benefits; (3) calculating interest on the figure so determined from June 23, 1983, at the statutory rate as provided in section 3 of "An Act in relation to the rate of interest and other charges in connection with sales on credit and the lending of money" (Ill. Rev. Stat. 1981, ch. 17, par. 6403); and (4) recalculating McCoy's costs, including the costs of this appeal; and then entering a new order in accordance with the views expressed in this opinion.

Affirmed in part, reversed in part, and remanded with directions.

TRAPP and GREEN, JJ., concur.